08 CV 7285

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALEX CORDERO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. |
| SLM CORPORATION, SLM CORPORATION RETIREMENT COMMITTEE, ANN TORRE BATES, WILLIAM M. DIEFENDERFER, III, THOMAS J. FITZPATRICK, EARL A. GOODE, DIANE SUITT GILLELAND, RONALD F. HUNT, ALBERT L. LORD, BARRY A. MUNITZ, A. ALEXANDER PORTER, JR., WOLFGANG SCHOELLKOPF, STEVEN L. SHAPIRO, CHARLES ELLIOTT ANDREWS, SANDRA L. MASINO, JOHN MCMANUS and JOHN DOES 1-10. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION COMPLAINT **JURY TRIAL DEMANDED** |
| Defendants. | | |

RECEIVED
AUG 15 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Alex Cordero ("Plaintiff"), a participant in the Sallie Mae 401(k) Savings Plan (the "Plan")[1] during the proposed Class Period (defined below), alleges as follows on behalf of the Plan, himself and a class of all others similarly situated:

## INTRODUCTION

1.    This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

---

[1] This case is also brought on behalf of the Sallie Mae 401(k) Retirement Savings Plan, the assets of which are represented by an approximate 7% interest in the Plan's Master Trust.

2.      Plaintiff was employed with SLM Corporation ("Sallie Mae" or the "Company") and was a participant in the Plan during the Class Period, during which time the Plan held interests in the Company's common stock.  Plaintiff's retirement investment portfolio in the Plan during the Class Period included Sallie Mae stock.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  Common stock of Sallie Mae was one of the investment alternatives of the Plan throughout the Class Period.

4.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's heavy holdings of Sallie Mae stock.

5.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to her, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer Sallie Mae common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company' financial condition and the prudence of investing in Company stock; and (3) maintaining the Plan's pre-existing heavy investment in Sallie Mae equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension

2

plans, which are designed to help provide funds for participants' retirement. See ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.    Plaintiff's Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.    Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Sallie Mae stock as an investment option and investing Plan assets in Sallie Mae stock when it was no longer prudent to do so.

8.    Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plan's assets in Sallie Mae equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions; (b) Sallie Mae failed to adequately reserve for losses in its non-traditional loan portfolio; (c) the Company had far greater exposure to anticipated losses and defaults related to its non-traditional loan portfolio than it had previously disclosed; (d) Sallie Mae's business model was unprepared for legislative changes that would result in a reduction in federal student lender rate subsidies and an increase in lender risk; (e) given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal loans and private education loans,

which would have a direct material negative impact on its loan originations going forward; (f) given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs; (g) as a consequence of the above, the Company's stock price was artificially inflated; and (h) heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

9.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

## PARTIES

**Plaintiff**

4

12.     Plaintiff Alex Cordero is a "participant" in the Plan, within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Sallie Mae shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Sallie Mae**

13.     Defendant Sallie Mae is a Delaware corporation with its principal executive offices located in Reston, Virginia.

14.     Sallie Mae is the named Plan Sponsor for the Plan and the Plan Administrator. *See* SEC Sallie Mae Form 11-K for the fiscal year ended December 31, 2007, filed with the SEC on June 27, 2008 ("2007 11-K").

15.     As the Plan Administrator, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and was therefore a fiduciary of the Plan in its own right.  Sallie Mae acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO") and other employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment, including, without limitation, the Company's Retirement Committee (described below).  *See* 2007 11-K.

16.     Sallie Mae had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors (the "Board") and otherwise, Sallie Mae had the authority and discretion to hire and terminate said officers and employees.  In addition, the Company and/or the Board also had the authority and discretion to appoint, monitor, and remove individual directors, officers and

employees from their individual fiduciary roles with respect to the Plan, including members of the Retirement Committee.

17.     By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Retirement Committee and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

18.     Indicative of the Board's authority, the Board's Compensation and Personnel Committee ("Compensation Committee") was charged with responsibility for reviewing the Company's benefit programs and policies, in furtherance of such duty, empowered to obtain advice and assistance from any outside advisors.  *See* Sallie Mae Compensation and Personnel Committee Charter, *available at:* http://www.salliemae.com/about/investors/corp_governance/ ("Compensation Committee Charter") (accessed August 12, 2008).

19.     Further, the Board was directly responsible for appointing the members of the Retirement Committee.  *See* 2007 11-K ("Members of the Retirement Committee and Trustees of the Plan were appointed by the Board of Directors of the Corporation").  Upon information and belief, the Board also had the ultimate authority and obligation to appoint and remove other Plan fiduciaries, if necessary, in order to best serve the interests of Plan participants.

20.     Thus, the Company and the Board were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Director Defendants**

21.     Defendant Ann Torre Bates ("Bates") served as a member of the Board during the Class Period.  As a member of the Board, Defendant Bates was responsible for reviewing the Company's benefit programs and policies and was responsible for appointing, monitoring and removing members of the Retirement Committee.  *See* 2007 11-K.  Defendant Bates was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Defendant William M. Diefenderfer, III ("Diefenderfer") served as a member of the Board during the Class Period.  As a member of the Board, Defendant Diefenderfer was responsible for reviewing the Company's benefit programs and policies and was responsible for appointing, monitoring and removing members of the Retirement Committee.  *See* 2007 11-K. Defendant Bates was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Thomas J. Fitzpatrick ("Fitzpatrick") served as Chief Executive Officer and Vice Chairman of Sallie Mae from June 2005 to May 2007, and subsequently served as an advisor to the Company.  As a member of the Board, Defendant Fitzpatrick was responsible for reviewing the Company's benefit programs and policies and was responsible for appointing, monitoring and removing members of the Retirement Committee.  *See* 2007 11-K.  Defendant Fitzpatrick was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

24.    Defendant Earl A. Goode ("Goode") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period.  As a member of the Compensation Committee, Defendant Goode was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee.  *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K.  Defendant Goode was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

25.    Defendant Diane Suitt Gilleland ("Gilleland") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period.  As a member of the Compensation Committee, Defendant Gilleland was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee.  *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K.  Defendant Gilleland was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

26.    Defendant Ronald F. Hunt ("Hunt") served as a member of the Board during the Class Period.  As a member of the Board, Defendant Hunt was responsible for reviewing the Company's benefit programs and policies and was responsible for appointing, monitoring and

removing members of the Retirement Committee. *See* 2007 11-K. Defendant Hunt was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

27.     Defendant Albert L. Lord ("Lord") is Vice Chairman and CEO of Sallie Mae and served as Chairman of Sallie Mae from March 2005 to January 2008. During the Class Period, Defendant Lord personally sold 1.665 million shares of Sallie Mae stock, reaping $52.9 million in insider trading proceeds—yet took no steps whatsoever to protect the Plan and its participants from their impending losses. As a member of the Board, Defendant Lord was responsible for reviewing the Company's benefit programs and policies and was responsible for appointing, monitoring and removing members of the Retirement Committee. *See* 2007 11-K. Defendant Lord was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Defendant Barry A. Munitz ("Munitz") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period. As a member of the Compensation Committee, Defendant Munitz was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee. *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K. Defendant Munitz was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised

discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

29.    Defendant A. Alexander Porter, Jr. ("Porter") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period.  As a member of the Compensation Committee, Defendant Porter was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee.  *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K.  Defendant Porter was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

30.    Defendant Wolfgang Schoellkopf ("Schoellkopf") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period.  As a member of the Compensation Committee, Defendant Schoellkopf was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee.  *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K.  Defendant Schoellkopf was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

31.     Defendant Steven L. Shapiro ("Shapiro") served as a member of the Board, and, particularly, as a member of the Compensation Committee during the Class Period.  As a member of the Compensation Committee, Defendant Shapiro was charged with assisting the Board in reviewing and monitoring the Company's benefit programs and policies, including appointing, monitoring and removing members of the Retirement Committee.  *See* Compensation Committee Charter; *See also* Sallie Mae Definitive Proxy Statement, filed with the SEC on April 10, 2008; *See also* 2007 11-K.  Defendant Shapiro was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Retirement Committee Defendants**

32.     The Retirement Committee is a committee of employees appointed by the Board and delegated certain day-to-day responsibilities for the administration of the Plan.  *See* 2007 11-K.  For instance, the Retirement Committee selects the Plan's investment options.  *Id.*  Upon information and belief, the Retirement Committee is likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.

33.     The Retirement Committee and its members were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

34.     Defendant Charles Elliott Andrews ("Andrews") served as a member of the Retirement Committee during the Class Period.  Defendant Andrews also served as the Company's Chief Financial Officer from February 2006 through January 2008, as Chief

Executive Officer from May 2007 through December 2007 and was named President of the Company in December 2007. Defendant Andrews also signed the 2007 11-K. Defendant Andrews was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

35.    Defendant Sandra L. Masino ("Masino") served as the Company's Chief Accounting Officer during the Class Period. Upon information and belief, Defendant Masino also served as a member of the Retirement Committee. Defendant Masino signed the Plan's 2006 11-K submission to the SEC on June 27, 2007. Upon information and belief, Defendant Masino was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

36.    Defendant John McManus ("McManus") served as the Company's Vice President, Corporate Tax, during the Class Period. Upon information and belief, Defendant McManus also served as a member of the Retirement Committee. Defendant McManus signed the Plan's 2006 Form 5500 annual report on October 10, 2007, as the "individual signing as plan administrator." Upon information and belief, Defendant McManus was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Additional "John Doe" Defendants**

37.    Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Retirement Committee, as well as other Company officers,

directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe

Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will

seek leave to join them to the instant action under their true names.

## THE PLAN

38. The Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of

ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan

and its participants/beneficiaries.

39. Specifically, the Plan is a "defined contribution plan" within the meaning of

ERISA § 3(34), 29 U.S.C. § 1002(34).

40. As described herein, the Plan is sponsored by Sallie Mae and is administered by

the Company through the Board and the Retirement Committee.[2]

41. The Plan provides for both participant elective deferrals and employer matching

contributions.

42. Qualified employees of Sallie Mae and its participating subsidiaries employed

prior to August 1, 2007 are eligible to participate in the Plan.[3]

43. Participants may make tax deferred contributions of up to 75% of their eligible

compensation, as defined by the Plan.

44. The Company may make matching contributions, at the discretion of the Board.

After one year of service, the Company makes matching contributions in an amount equal to

100% of the participant's contributions up to 6% of the participant's eligible compensation.

---

[2] The information contained in this section is taken from the 2007 11-K, unless otherwise indicated.

[3] Effective August 1, 2007, the Plan was frozen to new participation. Eligible employees employed prior to August 1, 2007 may enter the Plan after one month of service.

45.    Participants are vested immediately in both their own and the Company's contributions.

46.    Contributions are invested pursuant to participants' investment directives. Investment options are selected by the Retirement Committee, which is appointed by the Board. The Plan offered a number of investment options, including the Sallie Mae Stock Fund.

47.    Each participant's account is credited with the participant's contributions, the Company's contributions and earnings thereon.

48.    Indicative of the Plan's losses, as of December 31, 2006, $53,848,064 in Plan assets was invested in the Sallie Mae Stock Fund. Just one year later, the value of the Plan's investments in the Company Stock Fund had plummeted to $19,304,694.

## CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between January 18, 2007 and the present (the "Class Period") and whose Plan accounts included investments in Sallie Mae common stock.

50.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Sallie Mae stock.

51.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

> (a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

> (b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

> (c)    whether Defendants violated ERISA; and

> (d)    whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

54.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

55.    Class action status is also warranted under the other subsections of Rule 23(b)

because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### DEFENDANTS' FIDUCIARY STATUS

56.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

57.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

58.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, the Company, the Board and the Plan Committees were named fiduciaries of the Plan.

59.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Sallie Mae chose to internalize certain vital aspects of this fiduciary function.

60.     The Company administered the Plan and the Plan's assets through the Board and the Retirement Committee, which had discretionary authority to manage and control the operation and administration of the Plan and investment of Plan assets, as noted and described above.  The Company, through the Board and/or certain executive defendants, was responsible for appointing, evaluating and monitoring the members of the Retirement Committee, as well as any other employees/agents to which responsibilities concerning the administration of the Plan and investment of Plan assets were delegated.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

61.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

62.    Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

63.    Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003) ("An ERISA fiduciary may not knowingly present false information regarding a plan investment option to plan participants."); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations

or omissions."); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

64.    A plan fiduciary also "has an affirmative duty to inform beneficiaries of circumstances that [as alleged herein] threaten the funding of benefits." *Acosta v. Pacific Enter.*, 950 F.2d 611, 619 (9th Cir. 1991); *see also In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003)("There is no exception to the obligation to speak truthfully when the disclosure concerns the employer's stock.")

65.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

66.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[4] concerning investment in company stock, including that:

---

[4]    Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c)    Employees tend not to change their investment option allocations in the plan once made;

(d)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(e)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(f)    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

67.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the significant investment of the Plan's assets in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

**DEFENDANTS' CONDUCT**

68.    Sallie Mae, through its subsidiaries, provides education finance in the United States. It originates and holds student loans by providing funding, delivery, and servicing support for education loans through its participation in Federal Family Education Loan Programs

---

Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

("FFELP") and through offering non-federally guaranteed private education loans. The Company primarily markets its FFELP Stafford and private education loans through on-campus financial aid offices. It also engages in a debt management operations business, which provides a range of accounts receivable and collections services, including student loan default aversion services, defaulted student loan portfolio management services, contingency collections services for student loans and other asset classes, and accounts receivable management and collection for purchased portfolios of receivables.

69.     In addition, the Company purchases and manages sub-performing and non-performing mortgage loans. Further, it provides a range of other financial services, processing capabilities, and information technology to educational institutions, lenders, students and their families, and guarantee agencies.

**A.     Sallie Mae Was Plagued with Problems, Yet Downplayed or Concealed the Truth Regarding the Impact Upon its Future Prospects**

70.     On January 18, 2007, the first day of the Class Period, the Company issued a press release concerning its earnings for the fourth quarter of 2006 and reported increased earnings over the prior year period. The Company also announced that it had made a "record amount of loans." Further, Sallie Mae said that its fee-based businesses had exceeded $1 billion and its managed loans grown 16% to $142 billion. *See* Sallie Mae Form 8-K Submission to the SEC, filed January 18, 2007.

71.     On February 1 and 2, 2007, Defendant Lord sold 400,000 shares of his personal holdings in Sallie Mae stock for an average price of $45.80 per share reaping $18.3 million in insider trading proceeds.

72.     This stock sale by Defendant Lord was especially fortuitous as it came just days before the public release of President Bush's budget proposal on February 5, 2007. In the

President's budget, he proposed cutting student lender rate subsidies and increasing lender risk. Of course, such news was detrimental to Sallie Mae and sent the Company's shares down 9% in a day. The timing of Defendant Lord's sale prompted separate investigations by the Securities and Exchange Commission ("SEC"), the U.S. House of Representatives' Committee on Education and Labor and the U.S. Senate Committee on Health, Education, Labor and Pensions. *See Sallie Mae Trading Queried*, The New York Times (February 14, 2007) (unsigned article).

73.    On March 16, the CBS Evening News reported an allegation that Sallie Mae had been asked to pay for travel to Paris for a financial aid director from the University of Texas-Austin—a university that included Sallie Mae on its "preferred lender" list. The news report indicated that college students were being harmed by such preferred lender lists and incentives provided to school officials. Sallie Mae denied the veracity of the report. *See* Sallie Mae Responds to CBS Evening News, available at: http://sev.prnewswire.com/banking-financial-services/200703020/DCTU01720032007-1.html (March 20, 2007), accessed March 20, 2008.

74.    On April 11, 2007, New York Attorney General Andrew Cuomo announced that a settlement with Sallie Mae regarding the state's investigation of the Company's payment of kickbacks and other incentives to financial officers at educational institutions. Under the agreement, Sallie Mae agreed to discontinue call centers or other staffing for college financial aid offices, discontinue paying financial aid officers for appearing on advisory boards, and discontinue paying for any trips or travel for any financial aid officer. *See* Press Release: "Attorney General Cuomo Announces Settlement with Sallie Mae Over its Student Loan Practices," available at: http://www.oag.state.ny.us/press/2007/apr/apr11a_07.html, accessed March 21, 2008.

75.     Meanwhile, since the fall of 2006, the Company had been involved in discussions concerning a potential buyout.  *See* Sallie Mae Form DEFM14A Proxy Statement, filed with the SEC on July 18, 2007.  Then April 13, 2007, news surfaced that Sallie Mae was in talks to be bought out by a private equity firm.

76.     Three days later, on April 16, 2007, Sallie Mae announced that it had reached a deal to be bought out.  The Company issued a press release entitled "Investor Group to buy Sallie Mae for $25 billion."  The release stated, in part:

> An investor group led by J.C. Flowers & Co. has signed a definitive agreement to purchase SLM Corporation, commonly known as Sallie Mae, for approximately $25 billon or $60.00 per share of common stock, the companies announced today.
>
> When the transaction is complete, J.C. Flowers along with private-equity firm Friedman Fleischer & Lowe will invest $4.4 billion and own 50.2 percent, and Bank of America and JPMorgan Chase each will invest $2.2 billion and each will own 24.9 percent.   Sallie Mae's independent board members have unanimously approved the agreement and recommended that its shareholders approve the agreement.

*See* Press Release Issued by Sallie Mae, attached as Exhibit 99.1 to Form 8-K Submission to the SEC, filed April 18, 2007.

77.     The Company touted the proposed merger as an "exciting, new chapter in Sallie Mae's history."  *See Id.*  On news of the merger, Sallie Mae's stock increased approximately 18% from the low $40s to the mid $50s on unusually high trading volume.  *See* John Spence & Robert Schroeder, *Sallie Mae Going Private for $25 Billion*, Marketwatch.com (April 16, 2007).

78.     On April 24, 2007, the Company issued a press release, wherein it boasted of its first quarter results and of its pending merger.  The Company stated that its loan volume had grown; specifically, that its portfolio of managed loans had grown 18% during the first quarter of 2007.  Further, the Company stated that its loan purchases had increased by 45%; that its internal lending brand originations had increased by 35% and that its direct-to-consumer private

education loans increased by 64%.  The Company also touted its upcoming merger.  *See* Sallie

Mae Form 8-K Submission to the SEC, filed April 24, 2007.

79.    On April 26, 2007, United States Senate investigators announced an investigation

into Sallie Mae's debt collection practices, launched by the Senate Education Committee.

Allegedly, Sallie Mae had attempted to collect debts that were not actually owed, fired

employees who tried to help borrowers and purposefully sent payment notices to an incorrect

address in order to force a borrower into default.  The investigation also involved allegations that

Sallie Mae had refused to negotiate with borrowers, even threatening at least one borrower with

imprisonment.  *See* Amit R. Paley, *Probe Launched on Sallie Mae Collection Tactics*,

Washington Post (April 27, 2007).

80.    In May 2007, Sallie Mae announced the resignation of its CEO, Thomas J.

Fitzpatrick.  Then, on May 24, 2007, Congressional investigators revealed that Sallie Mae

executives had met with White House budget officials less than two months before Defendant

Lord sold $18.3 million of Sallie Mae stock.  Just three days after the sale, President George W.

Bush unveiled a budget that included substantially slashed subsidies to student loan providers.

The disclosure was made by a House education committee, which was investigating Defendant

Lord's huge liquidation of personal holdings in Sallie Mae stock.  *See* Nancy Zuckerbrod, *Sallie

Mae Stock Sale Timing Questioned*, FoxNews.com (May 24, 2007).  Earlier, in February 2007,

the Washington Post had reported that Defendant Lord would have receive approximately $1.4

million less from his disposition had he sold his shares on the day that the Bush administration

unveiled its budget.  *See* Amit R. Paley, *OMB Talks Preceded Sallie Mae Stock Sale*,

Washington Post (May 25, 2007).

81.     In mid-2007, problems began to arise with respect to the pending merger.  On July 11, 2007, Sallie May announced that the acquiring entity, owned by affiliates of J.C. Flowers & Co., Bank of America and JPMorgan Chase, had informed the Company that it believed that certain legislative proposals pending before the U.S. House of Representatives and U.S. Senate could result in a failure of the conditions precedent to the to the closing of the merger.

82.     Sallie Mae attempted to downplay the impact of this development upon the pending buyout and insisted that the new legislation, "The College Cost Reduction and Access Act of 2007," would not have a meaningful impact on its business.  However, upon this news, the Company's stock price retreated to the low $50s.

83.     On July 17, 2007, the Company announced its second quarter 2007 results.  Once again, Sallie Mae touted an increase in the volume of its loan portfolio and a substantial increase in loan originations.  At the time, the Company's chief executive officer, C.E. Andrews, stated, "Our loan portfolio continues to register strong growth, and our internal brands are outpacing the market."

84.     Meanwhile, the problems continued to severely plague the pending merger. Throughout the summer and fall of 2007, severe problems within the subprime mortgage market triggered substantial problems within the domestic credit markets.

85.     Thus, despite Defendants' hopes of cashing out, Sallie Mae's acquisition deal began to collapse as the buyer group refused to consummate the merger per the original terms of the merger agreement, due to the recent change in legislation and the turmoil in the credit market.

86.     In an October 2, 2007 letter, the buyer group took the position that the impact of cuts in federal subsidies to student lenders and the rising borrowing costs in the credit markets

would slash Sallie Mae's core earnings by more than 14% in 2009 and that this constituted a

"material adverse event," as defined in the merger agreement.  *See* Jason Kelly and Edward

Evans, *When Deals Go Sour: The Case of Sallie Mae*, International Herald Tribune (October 23,

2007).

**B.**    **The Truth Emerges**

87.    Desperate to keep from losing its acquisition deal (or being forced to accept a

reduced offer), on or about October 8, 2007, Sallie Mae filed a lawsuit in Delaware, seeking to

force its buyers to complete the deal.  *See* Andrew Ross Sorkin and Michael J. de la Merced,

*Sallie Mae Sues to Force a Buyout*, The New York Times (October 9, 2007).  Essentially, Sallie

Mae took the position that the new legislation cutting government subsidies to student lenders

would not materially affect the Company's financial health; however, the buyers—the private

equity firms J.C. Flowers & Fleisher & Lowe, as well as JPMorgan Chase and Bank of America

disagreed.  Meanwhile, the New York Times reported that, according to some sources, Sallie

Mae had borrowed close to $29 billion from a $30 billion credit line provided by JPMorgan

Chase and Bank of America and that the Company sought the credit line as a backstop for

liquidity.  "As the markets tightened, the Company found itself unable to issue commercial

paper to cover some of its debt.  It then drew heavily on the bank loans."    All the while,

Defendant Lord remained defiant, claiming that, even if the acquisition deal fell apart, the

Company could easily find a new buyer.  *See* Michael J. de la Merced, *Either This Deal or a*

*New One, Sallie Mae Chairman Says*, The New York Times (October 12, 2007).

88.    On October 11, 2007, Sallie Mae announced its results for the third quarter of

2007.  Again, the Company boasted of an increase in its loan volume and originations over the

prior year period.  *See* Sallie Mae Form 8-K Submission to the SEC, filed October 11, 2007.

89.     As the market began to learn the extent to which the deterioration in the credit market and the extent to which the new legislation would negatively affect Sallie Mae's business, throughout November 2007, Sallie Mae's stock continued to drift downward from the mid-$40s range at the beginning of the month to mid to upper $30s by the end of the month.

90.     To make matters worse, as the subprime market began to rapidly deteriorate in early 2007, Sallie Mae experienced a high level of defaults in its non-traditional portfolio. Sallie Mae offers its loans to students attending both traditional schools and non-traditional schools. Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees. Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical programs. For-profit schools are institutions that are run by private profit-seeking companies or organizations. They make up a small segment of students attending colleges and universities.

91.     The graduation rate at the non-traditional schools is much lower than the graduation rate at the typical schools. Graduation is critical to student loan lenders as graduates tend to earn more and experience lower rates of unemployment than non-graduates, both of which are key factors for borrowers being able to pay back their student loans. Additionally, the students attending non-traditional schools tend to have a lower tier credit quality and many of them fall into the category of subprime borrowers. However, despite evidence that Sallie Mae's loan loss provisions for its subprime borrowers attending non-traditional schools were inadequate both prior to and at the start of the Class Period, Sallie Mae failed to adequately reserve for losses in its non-traditional portfolio.

92.     Upon information and belief, Sallie Mae's loan loss provisions for its non-traditional portfolio remained at inadequate levels during the Class Period.

93.    In late 2007, reports of the merger's demise became prevalent.  Finally, on December 12, 2007, the Company acknowledged that the proposed buyout deal had, essentially, collapsed.  In a statement, the Company announced, in part:

> To address recent reports in the marketplace regarding the proposed buyout of Sallie Mae by a group led by J.C. Flowers, Bank of America and JP Morgan Chase, the company's Board of Directors states the following:

> Over the past eight weeks, in a series of discussions between the company and senior representatives of the Flowers group, Sallie Mae has indicated that, to resolve the dispute between the parties, the company offered to consider an alternative transaction with the Flowers group, and to give them the opportunity to update their due diligence and submit a new proposal to acquire the company with no pre-conditions.

> The buyer's group has indicated to Sallie Mae that it does not wish to pursue these opportunities.

94.    This was the Company's first public acknowledgement that it had attempted to renegotiate the acquisition deal.  *See* Michael J. de la Merced, *At Sallie Mae, a Rejection and a Downward Forecast*, The New York Times (December 13, 2007).

95.    Sallie Mae disclosed that its business had been negatively affected as a result of higher funding costs.  The Company revealed lowered expectations for its fourth quarter 2007 earnings, due to funding costs and increased reserves for the FFELP loan portfolio. Additionally, Sallie Mae admitted that it had lowered its 2008 core earnings EPS guidance from $3.25 to a range of $2.60 to $2.80, "due primarily to increased costs from replacing the company's interim funding facility."

96.    Sallie Mae also announced that, with respect to its equity forward contracts, it had reduced the strike and trigger prices with its counterparties and, that, as a result, the Company's aggregate position on equity forward contracts was 48.2 million shares at an average strike price of $43.93, with trigger prices ranging from $26.00 to $19.58.

97.     Still, the Company refused to acknowledge the true extent of its problems. Rather, Sallie Mae stated that "the underlying business drivers for the company are strong…" and announced an executive reorganization.

98.     Further, Sallie Mae announced that, whereas its directors and executive officers had previously been restricted from trading Company stock due to the pending merger, they would not be allowed to do so.

99.     The December 12, 2007 announcements were part of a series of partial disclosures and revelations concerning the truth about Sallie Mae's business operations, finances, business metrics, and future business and financial prospects.  Nonetheless, Sallie Mae's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by defendants.  Upon this partial disclosure, however, Sallie Mae's stock dropped $3.45 per share on December 12, 2007, to close at $28.49 per share, a one-day decline of 12% on extremely high trading volume.

100.    On December 13, 2007, the Company was forced to reveal more disturbing news regarding its equity forward contracts.  In a press release entitled "SLM Corporation provides Update on Equity Forward Contracts," Sallie Mae announced that it had amended or closed out certain of its equity forward contracts.  As a result, the Company's aggregate position on equity forward contracts was 44.0 million shares at an average strike price of $44.30, with trigger prices ranging from $24.75 to $19.58.

101.    On December 14, 2007, the Board appointed its Chairman, Defendant Lord, to the position of Chief Executive Officer of the Company.  C.E. Andrews, who had served as chief executive officer, was named president.

102.    Also on December 14, 2007, Defendant Lord took drastic action to protect his own interests, but did absolutely nothing to protect the retirement savings of Plan participants.  On December 14, 2007, Defendant Lord sold **1,265,401 shares** of his personal holdings in Sallie Mae stock for an average price of $27.36 per share reaping a whopping **$34.6 million** in insider trading proceeds.

103.    This stock sale by Defendant Lord was again fortuitous, as it came just days before Sallie Mae would host a conference call in which it would disclose that the Company might be facing higher financing costs and that the Company would need to add capital.  This news sent Sallie Mae's shares tumbling – closing down 21% in a day.

104.    The suspicious and self-serving nature of Defendant Lord's stock sale raised many eyebrows and prompted another investigation by the SEC into the Company's disclosures in December 2007, both before and after its executives and directors traded their stock.

105.    On December 19, 2007, *The Wall Street Journal* published an article entitled "Sallie Mae Understated Stock Sale by CEO Lord," which stated in part:

> Albert L. Lord, chief executive of student-loan titan SLM Corp., or Sallie Mae, sold slightly more SLM stock than the company announced last week.
>
> On Friday, Mr. Lord sold 1,265,401 shares of SLM, or 97% of his company stock, according to filings the company made yesterday with the Securities and Exchange Commission.  The sales were at an average price of $27.36 a share.
>
> That was more than Sallie Mae had disclosed, when it announced Friday evening that "Mr. Lord today sold 1.2 million shares of SLM common stock."  The company's release also overstated Mr. Lord's remaining holdings.
>
> A  Sallie  Mae  spokesman  acknowledged  the  errors  but  didn't comment further.
>
> Sallie Mae shares have fallen 40% since the beginning of the year, closing yesterday at $28.87, up 97 cents, in 4 p.m.  New York Stock Exchange composite trading.

The company's business has come under pressure since Congress agreed to cut subsidies for student-loan providers. In September, a group led by private-equity firm J.C. Flowers & Co. backed out of an agreement to buy Sallie Mae for $60 a share.

Sallie Mae had also described Mr. Lord's sale as "approximately 10% of his equity units" – meaning if one adds up the total number of Mr. Lord's shares, stock options and other derivatives on a one-to-one basis, the stock sale was of 10% of his total number of Sallie Mae equity instruments.

For almost all of Mr. Lord's stock options, the exercise price is higher than the current share price, making them worthless unless Sallie Mae's share price rises.

Accounting for his various derivatives at their fair values, Mr. Lord's transaction represents the sale of roughly three-quarters of his SLM holdings, said someone familiar with the matter.

106. On December 19, 2007, on the Company's shareholder conference call, the Company still refused to admit the true nature of its problems. Rather, in response to the market's concerns regarding its failed buyout deal, Sallie Mae took the opportunity to complain about "bad press for not doing a transaction." Further, a brash and defiant Defendant Lord dodged speaking of the failed merger, stating, "I'm not going to talk very much about it," and later ended the call with an expletive, stating, "*Let's go. There's no questions. Let's get the [expletive] out of here."* Additionally, the Company arrogantly reiterated confidence in its business model and prospects, with Defendant Lord boasting that the Company was "virtually recession proof."

107. However, the despite the Company's attempt to downplay its troubles, following the Company's December 19, 2007 conference call, Sallie Mae's stock dropped $5.98 per share, to close at $22.89 per share on December 19, 2007, a one-day decline of 21% on extremely high volume.

108. Thus, Plan participants continued to suffer—yet, Defendants did absolutely nothing to protect from losses to their retirement savings.

109.    The December 19, 2007 conference call was full of empty rhetoric, as *The Wall Street Journal* observed in a December 20, 2007 article entitled, "Sallie Offers Little on Strategy – CEO, in Investor Call, Fails to Assuage Worry as Shares Slide by 21%."  As the article noted, in part:

> Sallie Mae's chief executive rattled investors, declining to answer many questions about the student-loan company's finances and strategy amid concern about its prospects in the credit crunch.
>
> After a rambling conference call, which Chief Executive Albert L. Lord ended with an expletive, shares of Sallie Mae, officially SLM Corp., fell $5.98, or 21%, to $22.89.

110.    Rather than provide a clear picture of the Company's condition, Sallie Mae dodged the issue.  As one analyst noted, following the December 19, 2007 conference call, "'We were all kind of shaking our heads.  He didn't provide any real new information.'"  Rather, Defendant Lord "gave what amounted to a prickly defense of himself and his company's conduct."  *See* Michael J. de la Merced, *After Chief Holds a Chat, Sallie Mae Stock Plunges*, The New York Times (December 20, 2007).

111.    Furthermore, due to the utter collapse of the Company's stock price by December 19, 2007, most of the trigger prices as set by the Company's equity forward contracts had been reached – meaning that the Company had lost its bet on its own share value and was required to settle its equity contracts.  Thus, Sallie Mae would be forced to raise billions of dollars in new capital to pay off the contracts.  *See* Michael J. de la Merced, *Hoping to Earn a Diploma*, The New York Times (March 7, 2008).

112.    As a result, on December 26, 2007, the Company announced a proposed $2.5 billion public offering of common stock and mandatory convertible preferred stock in order to raise the capital required to physically settle its outstanding equity forward purchase contracts. The offering closed on December 31, 2007, resulting in total net proceeds of $2.9 billion.

31

113.    Then, on January 3, 2008, the Company made further revelations regarding the true nature of its problems.  Sallie Mae revealed that, in addition to its increased funding costs, it had been "negatively affected by an index mismatch between the commercial paper rate, the index for determining the interest rate we earn on the vast majority of our FFELP student loan assets, and LIBOR, the index for determining the interest rates on a substantial portion of our debt used to fund these assets."  *See* Sallie Mae Form 8-K Submission to the SEC, filed January 3, 2008.

114.    Additionally, the Company finally revealed the impact of The College Cost Reduction and Access Act of 2007 upon its business model.  As the Company finally disclosed, the Act seriously impacted the profitability of Sallie Mae's FFELP business, "including a reduction in special allowance payments, the elimination of the "Exceptional Performer" designation and the corresponding reduction in default payments to 97% through 2012 and 95% thereafter, an increase in the lender paid origination fees for certain loan types and reduction in default collections retention fees, and account maintenance fees related to guaranty agency activities."  *See Id.*  Essentially, the Company finally acknowledged that it the Act would "significantly reduce and, combined with higher financing costs, could possibly eliminate the profitability of new FFELP loan originations, while increasing our risk sharing from our FFELP loan portfolio."  *See Id.*

115.    Accordingly, in contrast to its previous repeated touting of its increasing loan volume and originations, the Company would now need to *reduce* its loan origination activity, by: (a) being more selective in pursuing origination activity in both FFELP loans and private education loans; and (b) curtailing less profitable student loan acquisition activities such as spot purchases and wholesale consolidation loan purchases.  *See Id.*

116.    The Company also had to adjust its private education loan pricing to reflect the current financing and market conditions, as well as eliminate certain borrower benefits offered in connection with its FFELP loans and private education loans

117.    Additionally, the Company changed its story regarding the huge insider sale by Defendant Lord, revealing that Defendant Lord had sold approximately 1.3 million shares of Sallie Mae stock, representing approximately 97% of the common stock he owned before the sale. This was in larger than the Company's previous acknowledgement of Defendant's Lord's stock disposition.

118.    Following these revelations, Sallie Mae's stock dropped $2.49 per share, to close at $16.67 per share on January 4, 2008, a one-day decline of 15% on volume four-times the average three-month volume. This was the lowest Sallie Mae's stock had traded since October 2000.

119.    On January 22, 2008, Corinthian Colleges, Inc. ("Corinthian"), a for-profit post-secondary education company, revealed that, effective March 1, 2008, Sallie Mae, which had previously provided 90% of the private loans for its students, would no longer provide private loans for its students that presented higher credit risks; i.e., subprime borrowers. According to Corinthian, it had received a letter from Sallie Mae on January 18, 2008, indicating that it was exiting the subprime lending business for private student loans. *See* Corinthian Form 8-K Submission to the SEC, filed January 22, 2008.

120.    Thereafter, other institutions in the for-profit sector, including Career Education Corp. and Lincoln Educational Services Corp., made similar disclosures regarding Sallie Mae's change in policy.

121.    On January 23, 2008, the Company revealed that it had recorded a loan loss

provision of $575 million on a GAAP basis, or $750 million on a "core earnings" basis, in the 2007 fourth quarter that contributed to a net loss of $139 million for the quarter and reduced earnings for the year. Sallie Mae blamed in the increase in the loan loss provision on the actual and expected performance of the non-traditional, higher-risk portion of the company's managed student loan portfolio. The Company also revealed that its GAAP net loss for 2007 totaled $896 million, compared to GAAP net income of $1.2 billion in 2006. The 2007 GAAP results included principally the forward contract mark-to-market loss and private loan loss provision of $884 million. *See* Sallie Mae Form 8-K Submission to the SEC, filed January 23, 2008.

122. Additionally, in the Company's conference call held on January 23, 2008, the Company made several admissions concerning its loan loss provisions. For instance, Defendant Lord stated, part: "Sallie Mae may have lent too much money to students who have gone to schools without very good graduation records. Such students at such schools are virtually singly responsible for 60% of the '07 credit losses. Our methodology in creating loan loss provisions tended to look backwards."

123. On January 29, 2008, Sallie Mae reported that it had entered in a Settlement, Termination and Release Agreement, terminating the proposed buyout by the JPMorgan/J.C. Flowers consortium.

124. Following Sallie Mae's revelation of the truth involving its student loan portfolio and originations, including its anticipated increase in defaults and need to screen student loans more closely, the Company's shares have lost more than half their value. As the turmoil within the credit market continued, Sallie Mae found itself stymied in its effort to securitize and resell student loans in the secondary market. For example, approximately $80 billion of the auction rate securities market is comprised of securitized student loans. "The spreads on securities based

on student loans have recently widened to near-historic highs, and auctions that set the interest rate on many of these securities have failed because of feeble investor demand." *See* Michael J. de la Merced, *Hoping to Earn a Diploma*, The New York Times (March 7, 2008); *See also* Marcy Gordon, *Lawmakers Ask Fed Help for Student Loans*, BusinessWeek.com (March 18, 2007) (available at: http://www.businessweek.com/ap/financialnes/DVG4QFG0.htm, accessed March 20, 2008). The Company's problems have continued. On July 23, 2008, Sallie Mae reported weaker-than-expected results for the second quarter of 2008, including a 72% drop in profits, compared to the second quarter of 2007.

125.    As a result of Defendants' conduct, statements and attempt to downplay the truth concerning the Sallie Mae's condition and future prospects, the Company's stock price traded at inflated levels during the Class Period. However, as the truth became known, the Company's shares plummeted more than 70% from their Class Period and near all-time high of $57.98 per share in July 2007.

**C.    Defendants Knew or Should Have Known That Sallie Mae Stock Was an Imprudent Investment for the Plan, Yet Failed to Protect the Plan's Assets.**

126.    Throughout the Class Period, Sallie Mae was exposed to and suffered substantial losses. As the Company's problems continued throughout the Class Period, Defendants knew or should have known that the value of the Company's stock would suffer and, consequently, that the heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants. However, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Sallie Mae stock.

127.    As described above, certain of Defendants had a very strong financial incentive to conceal the truth of the Company's potential exposure and keep the Company's stock price

artificially high—and did exactly that.

128.    Defendants reassured and/or mislead Plan participants during the relevant period, and did nothing to protect the heavy investment of their retirement savings in Sallie Mae stock.

129.    Sallie Mae's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing the Company and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock.  Defendants further knew or should have known that the Company's stock price would plummet—and that the Plan's assets would suffer tremendously and unnecessarily—once the truth became known.

130.    As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in Sallie Mae stock, suffered unnecessary and unacceptable losses.

131.    Through their high ranking positions within the Company - especially the Director Defendants and executive-members of the Retirement Committee, Defendants knew or should have known of the existence of the above-mentioned problems.

132.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

133.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Sallie Mae stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

134.    In addition, upon information and belief, Defendants failed to adequately review

the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether Sallie Mae stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Sallie Mae's problems so that participants could make informed decisions regarding whether to include Sallie Mae stock in the Plan.

135.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Sallie Mae stock, under these circumstances—with undisclosed, substantial exposure to subprime mortgage-related losses— was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

136.    Because Defendants knew or should have known that Sallie Mae was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan' investment in Sallie Mae stock.

137.    Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of Sallie Mae stock; discontinuing further contributions to and/or investment in Sallie Mae stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Sallie Mae they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Sallie

Mae stock.

138. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Sallie Mae stock. In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Sallie Mae's problems came to light.

## D.    Defendants Suffered From Conflicts of Interest

139. In recent years, Sallie Mae has engaged in equity forward contracts related to the Company's securities as a way to raise money without borrowing. In an equity forward contract, an issuer sells its securities to a buyer and agrees to repurchase the shares for a greater amount in the future. The issuer is essentially placing a bet that the price of its shares will rise. If the market value of the underlying securities falls below certain predetermined "trigger" levels, the buyer of the contract has the right to terminate the contract and settle all or a portion of the original contract price.

140. As of December 31, 2006, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $46.30 to $54.74 per share with trigger prices ranging from $20.84 to $35.58 per share. In February 2007, the Company amended its equity forward contracts, whereby the trigger prices were reduced with the highest trigger price being $30.11 per share. As of February 28, 2007, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $43.50 to $54.74 per share with trigger prices ranging from $23.93 per share to $30.11 per share. Given the nature of equity forward contracts, it was imperative that the Company maintain its share price above the predetermined trigger levels throughout the Class Period.

141. Furthermore, it was essential for Sallie Mae to maintain its share price in order to

promote the above-described merger agreement—which Defendant Lord had been negotiating since October 2006.  In a move to consummate the merger agreement, Sallie Mae misrepresented the Company's business and prospects.  These false statements about Sallie Mae's business were extremely important to the market and made the Company an attractive acquisition target.

142.    Further, members of the Board and Company executives would receive a massive windfall from the merger.  Collectively, they held 5 million shares of Sallie Mae stock, worth over $300 million, in the event that the merger proceeded as planned, as well as another 14.9 million vested share options.  The shares and options would vest immediately, meaning that the executives would not have wait for years for them to vest.  *See Sallie Mae Execs' Handsome Payday*, TheStreet.com (April 18, 2007).

143.    Additionally, the bonus pay of the executive officers was linked to the success of the buyout.  The Company amended its 2007 Bonus Plan by changing two of the five categories for corporate goals.  Among the changes, the category of "core earnings" operating efficiency ratio was eliminated and replaced with a target of closing the buyout deal.  Thus, essentially, the managers' bonuses could be reduced if the merger was not consummated.  *See* Sallie Mae Form 8-K Submission to the SEC, filed October 31, 2007.

144.    On May 25, 2007, Sallie Mae filed its Preliminary Proxy Statement relating to the merger.  Pursuant to the Proxy Statement, the Company disclosed that its officers and directors had certain interests in the merger that were different from the interests of the Company's shareholders, including the potential to receive large cash payments upon consummation of the merger and indemnity agreements which would protect the executives from past misconduct.  The cash payments were to be based upon the conversion of the officers' and directors' equity interests in the Company at the effective time of the merger which

included the automatic vesting of all outstanding stock options.  At the time of the merger, Defendant Lord was to receive a cash payment of approximately **$225 million**.  *See also* Andrew Ross Sorkin, *The Money Game and the Mind Game at Sallie Mae*, New York Times (October 7, 2007); *See also* Peter Davis, *Sallie's Chairman Talks Tough and Plays Coy*, CNNMoney.com (October 11, 2007).

145.    Upon information and belief, the Company falsely reported its results for year-end 2006 and for the first three quarters of 2007 by failing to adequately accrue its loan loss provisions, which overstated the Company's net income, and by concealing known trends and uncertainties with respect to its non-traditional loan portfolio.  As the truth became known, the Company stock price dropped significantly, to the detriment of the Plan and its participants.

146.    Further, Sallie Mae's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' annual compensation was in the form of equity awards that include stock options.

147.    Because the compensation of at least some of the Defendants was significantly tied to the price of Sallie Mae stock, Defendants had incentive to keep the Plan's assets heavily invested in Sallie Mae stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plan would have reduced the overall market demand for Sallie Mae stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Sallie Mae stock, resulting in reduced compensation for the Defendants.

148.    Some Defendants may have had no choice in tying their compensation to Sallie Mae stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up

to a large extent in Sallie Mae stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

149.    Further indicative of Defendants' conflicts of interest, at least one Defendant sold a substantial amount of his personal holdings of Sallie Mae stock, thereby protecting his own financial interests. Yet, Defendants did nothing to protect the Plan and its participants from the invariable losses the Plan would suffer as the Company's problems continued, the value of Company stock steadily slid and the news regarding the Company's problems finally came to light.

150.    These conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See In re WorldCom, Inc*., 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) ("When administering or managing a plan, a fiduciary must act solely in the interest of beneficiaries."); *Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004) (same).

## CLAIMS FOR RELIEF UNDER ERISA

151.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

152.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

153.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such

breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

154.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan **solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence** under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

155.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the **duties of loyalty, exclusive purpose and prudence** and are the "highest known to the law." *See Donovan v. Bierwirth,* 680 F.2d 263, 272, fn. 8 (2d Cir.1982*).*   They entail, among other things:

a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and

accurate information material to the circumstances of participants and beneficiaries.

156.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

157.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

158.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

159.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary

authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

160.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

161.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

162.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such

options made available under the Plan.  This duty applies to all of the Plan's investment options, including investment in Company stock.

163.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that, as described herein, the Sallie Mae Stock Fund was not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.  During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

164.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition, the Company's concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

165.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other

Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

166.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

167.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

168.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

169.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

170.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

171.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and

46

by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

172.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

173.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Sallie Mae & Director Defendants)**

174.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.    At all relevant times, as alleged above, Sallie Mae and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

176.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Sallie Mae and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Retirement Committee.

177.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Sallie Mae and the Director Defendants, had the duty to:

(1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

178.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries

with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

179.    Sallie Mae and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Sallie Mae and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering Sallie Mae stock as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Plan in Sallie Mae stock when it no longer was prudent to do so.  Despite this knowledge, Sallie Mae and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

180.    In addition, Sallie Mae and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Sallie Mae that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

181.    Sallie Mae and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

182.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

183.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

184.    The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

185.    Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company stock as an investment vehicle.  As a consequence, participants did not exercise independent control over their

investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

186.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

187.    As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

188.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

189.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and Beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

190.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to

be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

191.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## SECTION 404(c) DEFENSE INAPPLICABLE

192.    The Plan suffered losses, and Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in Sallie Mae stock during the Class Period in violation of the Defendants' fiduciary duties.

193.    As to contributions invested in Company stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

194.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of

liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i).

195.    ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Sallie Mae stock as an investment option in the Plan, as this is not a decision that was made or controlled by the participants.  As alleged above, Defendants failed to provide participants with complete and accurate information regarding the prudence investing Plan assets in Sallie Mae stock.  Accordingly, participants failed to exercise the requisite independent control over their investment in Sallie Mae stock in the Plan.  Thus, a fiduciary breach or an investment loss in connection with the Plan fiduciaries' selection of the Sallie Mae Stock Fund as a designated Plan investment alternative is not afforded relief under section 404(c) because it was not the result of participants' exercise of control.

196.    The Defendants' liability to the Plan, Plaintiff and the Class for relief stemming from the Plan's imprudent investments in Sallie Mae stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Sallie Mae maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Sallie Mae;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: August 15, 2008

Respectfully submitted,

By: _Curtis V. Trinko_
Curtis V. Trinko  (CT-1838)
**LAW OFFICES OF CURTIS V. TRINKO, LLP**
16 West 46th Street
Seventh Floor
New York, NY 10036

Telephone: (212) 490-9550
Facsimile: (212) 986-0158

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**Attorneys for Plaintiff and the Proposed Class**